IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

EARLEAN S. MOON          §
                         §
                         §
v.                       §          CIVIL ACTION NO. G-04-631
                         §
                         §
JO ANNE B. BARNHART,     §
COMMISSIONER OF SOCIAL SECURITY   §

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff Earlean S. Moon's action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting judicial review of a final decision of the Commissioner of the Social

Security Administration denying her claim for a period of disability and disability insurance benefits

under Title II of the Social Security Act, 42 U.S.C. § 401 *et. seq.*  Both parties have filed Motions

for Summary Judgment.  After considering the parties' motions and the record in this case, the Court

submits its Report and Recommendation to the District Court.

### I.

### BACKGROUND

**A.  Administrative Proceedings**

Plaintiff filed her application with the Commissioner on November 23, 1999, claiming that

her disability began on November 1, 1999, due to a fractured pelvis, hearing impairment, neck and

back pain, headaches, difficulty walking, and sitting.  Transcript ("Tr.") at 63, 90.  Her disability

insurance claim was denied initially and also upon reconsideration.  Tr. at 29, 30.

1

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held before an ALJ on April 12, 2001.  Tr. at 21, 372-384.  Plaintiff was represented by counsel at the hearing.  Tr. at 374.  On June 20, 2001, the ALJ issued an unfavorable opinion.  Tr. at 18-26. Plaintiff requested review of the ALJ's decision by the Appeals Counsel.  Tr. at 15.  On September 24, 2004, the Appeals Council denied Plaintiff's request for review.  Tr. at 6-9.  The decision of the ALJ thereby became the final decision of the Commissioner, and it is from this final decision that the appeal has been taken pursuant to 42 U.S.C. § 405(g).

**B.  Factual Background**

Plaintiff's date of birth is October 18, 1946, making her approximately 53 years old at the time she filed her application for disability benefits.  Tr. at 54.  She listed her prior work experience as that of an office manager for an automotive repair shop from March 1990 to October 1999 (Tr. at 64, 72-73, 84);  a secretary/treasurer for a sign placement business from 1986 to1994 (Tr. at 84); clerk in a hospital who performed pre-admissions and verified insurance from 1979 to 1989.  Tr. at 84.

Plaintiff's injuries first stemmed from several prior motor vehicle accidents and then falls. For example, the records reflect that in July 1988, Plaintiff was involved in rear-end accident in which she sustained cervical and lumbar sprain, however, following approximately 8 months of treatment, she was asymptomatic and released from care by Dr. Weiss.  Tr. at 178, 198, 217.  In July of 1989, after being involved in a motor vehicle related accident, Plaintiff experienced neck and back pain, as well as right calf pain for which she treated for approximately 5 months before being discharged from Dr. Weiss' care.  (Tr. at 179, 185, 198, 192).  In September 1990, after darting out of the way so that she would not be hit by another car, Plaintiff experienced low back pain that Dr.

Weiss diagnosed as lumbar sprain.  Tr. at 180-183.  In May 1992, Plaintiff was involved in another motor vehicle accident in which she sustained a pelvic fracture, multiple rib fractures, and she experienced pain in her neck, back, left hand, right ankle, and left knee.  Tr. at 159.  She again treated with Dr. Weiss for her injuries.  Tr. at 159.

After concluding her treatment for the 1992 accident, the records suggest that Plaintiff did not return to Dr. Weiss with complaints of pain until late February 1998, at which time reported that she was experiencing pain in her pelvic region.  Tr. at 149.  Dr. Weiss referred Plaintiff to physical therapy, and, his progress notes of June 17, 1998, reflected that Plaintiff had reached maximum medical improvement and she was returned to "full duty, no restriction" work status.  Tr. at 128.

In early January 1999, Plaintiff returned to Dr. Weiss with complaints of left wrist pain and pain in her buttocks after falling backwards off a porch step before Christmas.  Tr. at 126.  Dr. Weiss' diagnosis included "left wrist pain, possible triangular fibrocartilage tear, possible ulnar variance;" he ordered an arthrogram of her left wrist.  Tr. at 126.  Dr. Weiss also noted that Plaintiff had spasms in her right sacroiliac joint with the sciatic nerve on the right being painful on palpitation, but further noted that she was able to ambulate without a cane or crutches; she could stand on heels and toes; she was able to walk and work; she had good strong dorsiflexion; and her deep tendon reflexes were equal and active.  Tr. at 126.  At the recommendation of Dr. Weiss, Plaintiff began a six week course of physical therapy on January 11, 1999.  Tr. at 124-125.  At her initial therapy session the physical therapist noted a painful range of motion in her lower back.  Tr. at 124-125.  Plaintiff saw Dr. Weiss again on January 27, 1999.  Tr. at 122.  On this date, Dr. Weiss noted that she had an ulnar deviation in her left wrist with decreased range of motion ("ROM") in the wrist.  Tr. at  122.  With regard to her low back and hip pain, Dr. Weiss noted that, while

3

Plaintiff continued to have some pain in her left hip and low back, she was having no pain in the right hip, no sciatica, she was doing better with her exercises for her lower back, and she was working. Tr. at 122. Dr. Weiss also noted that she was able to walk without a cane or crutches; had no straight leg raising sign; no calf tenderness; no hamstring spasms; good strong dorsiflexion; and her deep tendon reflexes were equal and active. Tr. at 122-123.

The records do not reflect Plaintiff received medical care for her neck, back or coccyx pain from February 1999, until December 1999. Tr. at 108. On or about November 23, 1999, Plaintiff reportedly fell off a ladder and hurt her lower back, buttocks, and right knee. Tr. at 108, 219. Plaintiff initially treated with Dr. Weiss on December 6, 1999, and then only once again on January 6, 2000. Tr. at 108, 262. During the December 6, 1999, visit Dr. Weiss noted that, upon examination, Plaintiff experienced pain in her low back, buttocks and right knee. Tr. at 108. Dr. Weiss also noted that Plaintiff could ambulate without a crutch or cane; could stand on heels and toes; experienced no sciatica; had some pain in her right knee; and pain in her tailbone. Tr. at 108-109. During the January 6, 2000, visit Dr. Weiss documented Plaintiff's additional complaint of left wrist pain. Tr. at 262. Plaintiff reported to Dr. Weiss that the pain in her knee was "tolerable" when she did not have to put pressure on it and it was "slightly weak." Tr. at 262. Upon examination, Dr. Weiss noted that she had a 0-135 degree range of motion in her knee, but noted that there was pain on palpitation on the medial collateral ligament (MCL), and the lateral and medial femoral condyle. Tr. at 262. Plaintiff also reported that she continued to experience pain in her tailbone (Tr. at 262-263), but x-rays showed "no fractures, dislocations, or congenital anomalies...no evidence of angulation or displacement." Tr. at 105, 263. The x-rays of Plaintiff's lumbar spine showed "mild scoliosis," yet were otherwise unremarkable. Tr. at 120. Dr. Weiss diagnosed Plaintiff with

4

lumbar spondylosis and lumbar sprain on the left side involving the nerve root, and he recommended conservative care, which included walking as much as possible and other exercise.  Tr. at 262-263.

In between her visits to Dr. Weiss, Plaintiff went to the emergency room at UTMB on December 22, 1999, because she was experiencing pain in her pelvic area and her neck and low back.  She was examined, diagnosed with lumbar spondylosis and lumbar strain, and discharged home with prescriptions for Motrin and Darvocet.  Tr. at 344, 347.

On January 13, 2000, Plaintiff followed up with orthopedists at UTMB for the pain in her lower back and tailbone.  Plaintiff reported to doctors that due to her pain she could only stand for 3-4 hours and sit for 3-4 hours.  Tr. at 271.  Upon examination, the doctors found tenderness in her lumbar spine and pain over the left S1 joint and in the buttocks, but noted she had a full ROM in her hips; no atrophy in her lower extremities; equal reflexes; and 5/5 motor strength in all muscle groups.  X-rays of her lumbar spine showed some "mild spondylitic changes."  Tr. at 271.  She was prescribed Naprosyn and it was recommended that she perform exercises and activities as tolerated. Tr. at 272-273.

On February 10, 2000, Plaintiff saw Dr. Raj Mikkilineni, reportedly at the request of the Texas Rehabilitation Center.  Tr. at 101, 219.  Upon examination, Dr. Mikkilineni noted Plaintiff's neck was supple; there was tenderness in her low back; pain in extension and flexion of lumbar spine; no muscle atrophy in extremities; a normal gait; difficulty in squatting; pain with movement of right knee, but it was not restricted; some difficulty in hopping; and a normal heel-toe walk.  Tr. at 220-221. Dr. Mikkilineni's impression was arthritis in the right knee, post-traumatic arthritis in both hips and cervical and lumbar spine, and decreased hearing.  Tr. at 221.

On March 17, 2000, and again on April 6, 2000, Plaintiff saw Dr. William Bond.  Tr. at 265-

266.  In the April exam, Dr. Bond noted that Plaintiff has nearly full ROM in her back with extension, but noted a decreased ROM in her neck.  Tr. at 265.  The CT scans of her pelvis showed "no fractures or dislocation" (Tr. at 268, 270), and her lumbar spine showed mild degenerative changes at L5/S1 Tr. at 269.  Additionally, the MRI of her cervical spine showed "minimal broad-based disc bulges" at C3-4 and C4-5 levels, with no significant spinal stenosis or neural foraminal stenosis, and no abnormal signal within the cervical spinal cord.  Tr. at 267.

Dr. Bond referred Plaintiff to Dr. Heilman who saw her on May 18, 2000.  Tr. at 314.  Dr. Heilman, after examining Plaintiff and reviewing her prior diagnostic tests, diagnosed her with coccydynia and degenerative disk disease ("DDD") of the cervical spine, but did not see anything that warranted surgery.  Tr. at 314-315.  Dr. Heilman informed Plaintiff that her DDD would cause her "some achiness" periodically and, with regard to her tailbone pain, referred her back to her family practitioner with the suggestion that he "try her on some anti-inflammatories."  Tr. at 315.  Plaintiff returned to see Dr. Heilman on October 10, 2000, at which time he reiterated that surgery was not necessary.  Tr. at 315.

On June 1, 2000, Plaintiff returned to the Orthopedic Clinic at UTMB because of continued complaints of pain in her buttocks and lower back.  Tr. at 240-241; 340-341.  Upon examination, Plaintiff was found to have "some pain in buttocks on left side," but "minimal tenderness over the lumbar region."  Tr. at 240, 340.  Doctors also noted she had full ROM in her joints, including her hips, and a 5/5 motor strength.  Tr. at 240.  Doctors prescribed anti-inflammatories and pain medication, and recommended stretching exercises.  Tr. at 240-241; 340-341.

On July 3, 2000, Plaintiff presented at UTMB for a neurological consultation.  Tr. at 335.  She reported that she had episodes of passing out and that she experienced progressive bilateral leg

weakness and problems walking, but that she had not used a walker or cane for these problems.  Tr. at 335.  Upon neurological exam, the doctor found Plaintiff had 5/5 motor strength throughout, bilaterally, her sensation was intact, and her gait was stable.  Tr. at 335.  The MRI performed on July 27, 2000, showed a normal brain without evidence of signal abnormality, mass, mass effect, or hemorrhea.  Tr. at 331, 334.

Plaintiff was seen again at UTMB on August 7, 2000, due to complaints of neck and tailbone pain.  Tr. at 331.  Upon physical examination, Plaintiff was observed sitting in a chair in no apparent distress; found to have motor strength of 4/5 in her upper extremities and 5/5 in her lower extremities; normal bilateral reflexes; intact sensation; normal gait; and normal heel and toe walk.  Tr. at 332.  The notes reflected that Plaintiff also declined physical therapy.  Tr. at 332.  The doctor's assessment was "spondylosis with minimal C-5 radiculopathy."  The progress notes on this date also reflected that Plaintiff reported concerns that she had "tropical spastic paralysis."  Tr. at 98, 331.  While there were no myelopathic signs upon examination, the doctor ordered lab tests for HTVL-1 (Tr. at 331), which were negative.  Tr. at 329.

On September 21, 2000, Plaintiff returned to the outpatient orthopedic client at UTMB with complaints of low back pain.  Upon examination, doctors found no tenderness to palpitation of the lumbar region; no sensory deficits in either lower extremity; full ROM of the spine, hips and knees; 5/5 motor strength bilaterally in the lower extremities; and normal and symmetrical reflexes bilaterally in the lower extremities.  Tr. at 327.  Plaintiff was referred to physical therapy.  Tr. at 327.  Plaintiff attended physical therapy at UTMB on October 9th, October 24th, and November 13th, 2000.  Tr. at 325.  Physical therapist Nancy Martin initially noted some decreased ROM in her cervical spine, decreased hip strength, and weak abdominal muscles (Tr. at 323), but noted

improvement in the ROM in her cervical spine on November 13, 2000.  Tr. at 325.

On November 9, 2000, Plaintiff saw Dr. Bond who found that she had no low back tenderness on that date.  Tr. at 309.  On December 13, 2000, Dr. Bond's progress notes reflected that, upon examination, Plaintiff had full ROM in her neck, but he noted some tenderness in her lower back and coccyx.  Tr. at 311, 351.  On January 17, 2001, Dr. Bond noted back tenderness with decreased ROM.  Tr. at 350.

On January 22, 2001, Plaintiff returned to the orthopedic clinic at UTMB with concerns of a tailbone fracture and complaints of weakness in her legs.  Tr. at 318-319.  Upon examination, the orthopedist found no point tenderness in her back;  5/5 motor strength in her lower extremities; sensation was intact throughout;  her gait was normal; and her heel-toe walk was normal.  Tr. at 318-319.  The doctor ordered a bone scan (Tr. at 349), the results of which were normal, with no evidence of osseous metastatic disease or evidence of any acute fractures.  Tr. at 316.

On February 14, 2001, Dr. Bond found mild tenderness in her neck, good ROM in her neck, and a normal heel-toe walk.  On March 16, 2001, orthopedist at UTMB examined  Plaintiff and found she had a normal gait, intact sensation, and full ROM in her back.  Tr. at 358-359.

Finally, some time later, on December 30, 2002, Plaintiff reportedly fell at work.  Tr. at 369. Following this accident, a chiropractor sent her for a lumbar MRI, which showed a disc herniation at L-4-5 and L5.  Tr. at 369.  There are no other medical records regarding this incident in the record.

In addition to the evaluation and treatment she received for her injuries, Plaintiff has a long history of hearing problems, which date back to when she was a young child.  Tr. at 378.  She previously had hearing aids, but testified that they were broken in an automobile accident and not

replaced.  Tr. at 378.  Plaintiff's hearing was tested by an audiologist on November 26, 1999, and again on April 12, 2001, with findings of moderate to severe hearing loss binaurally, with hearing in the left ear being better than the right ear.  Tr. at 110-111, 354.  The audiologist recommended that she have a binaural hearing aid evaluation, and binaural amplification pending the results of the evaluation.  Tr. at 354.

After consideration of the entire record, the ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on November 1, 1999, the date the claimant stated she became unable to work, and continues to meet them through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since her alleged onset date of disability.

3.    The claimant has the following severe impairments: (1) degenerative disc disease of the cervical spine; (2) coccygodynia; and (3) moderate to severe sensorineural hearing loss.

4.    The claimant's impairments do not meet or equal in severity the medical criteria for any impairment described in Appendix 1 of the Regulations.

5.    The claimant has the residual functional capacity for light work.

6.    The claimant's testimony concerning subjective symptoms and functional limitations is credible and supported by the objective medical evidence only to the extent that she cannot do more than light work.

7.    The claimant can perform all of her past relevant work.

8.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

Tr. at 25-26.  Plaintiff requested review of the ALJ's decision.  Tr. at 10-17.  The Appeals Council denied review on September 24, 2004.  Tr. at 6-9.  Petitioner filed the instant suit and challenges the ALJ's decision at both steps 3 and 4 on various grounds as set forth below.

## II.

## DISCUSSION

### A. Standard of Review

A federal court reviews the Commissioner's denial of benefits only to ascertain whether (1) the final decision is supported by substantial evidence and (2) the Commissioner used the proper legal standards to evaluate the evidence. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Substantial evidence is defined as being more than a scintilla and less than a preponderance and of such relevance that a reasonable mind would accept it as adequate to support a conclusion. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). If the Commissioner's findings are adjudged to be supported by substantial evidence, then such findings are conclusive and must be affirmed. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). A court does not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. *Id.* Conflicts in the evidence are for the Commissioner, not the Court, to resolve. *Brown*, 192 F.3d at 496.

### B. Burden of Proof

A claimant bears the burden of proving he suffers from a disability under the Social Security Act. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). The mere presence of an impairment does not necessarily establish a disability. *Id.* A claimant is only disabled within the meaning of the Social Security Act if he has a medically determinable physical or mental impairment lasting at least 12 months that prevents him from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). To determine whether an individual is disabled, the

Commissioner utilizes the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(b)-(f).  If the Commissioner decides at any step along the way that an individual is not disabled, the evaluation process comes to a halt at that particular step and proceeding further becomes unnecessary.  *Barajas v. Heckler*, 738 F.2d 641, 643 (5th Cir. 1984).  If, however, the claimant shows that he is disabled under the first four steps, the burden then shifts to the Commissioner at the fifth step to demonstrate that the claimant can perform other substantial work in the national economy.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).  Finally, only if the final step in the process is reached does the fact-finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity.  *See Rivers v. Schweiker*, 684 F.2d 1144, 1152-1153 (5th Cir. 1982).

### C.  **Plaintiff's Challenges to ALJ's Step 3 Findings**

#### 1.  *Listing Impairment Issue*

Plaintiff alleges that the ALJ erred in finding that she had significant ROM in her spine  for purposes of Listing 1.05 because this finding is not substantially supported by the record.  Pl.'s Mot. at 5-6.  The Commissioner counters that there is ample evidence in the record indicating Plaintiff had good range of motion.  Def.'s Mot. at 5.

Impairment Listing 1.05(C), which was then in effect, provides the following:

> 1.05 *Disorders of the spine*:
> C.    Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months.  With both 1 and 2:
> 1. Pain, muscle spasms, and significant limitation of motion in the spine; and
> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

[Emphasis added].  20 C.F.R. § 404, Subpart P, App. 1,  §1.05.[1]

The ALJ found that "[t]he medical evidence fails to show that the claimant has significant limitation in range of motion in the spine, or the neurological deficits required to meet or equal the medical criteria under section 1.05C of the Listing."  Tr. at 22.  In so finding, the ALJ referenced progress notes from UTMB on January 22, 2001, a physical therapist's notes on October 9, 2000, and the written opinion of medical expert, Dr. Goldstein.  Tr. at 22.

The Court must scrutinize the record in its entirety to determine the reasonableness of the decision reached by the ALJ and whether substantial evidence exists to support the finding. *Johnson*, 864 F.2d at 343-44;  *Leggett v. Charter*, 67 F.3d 558, 564 (5th Cir. 1995).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  *Ripley*, 67 F.3d at 555.  Having reviewed the record in its entirety, this Court finds substantial medical evidence supports the ALJ's determination of this issue.  For example, on December 6, 1999, Plaintiff saw Dr. Weiss after re-injuring her back and his notes reflect that she ambulated without a crutch or cane, stands on heels and toes, no sciatica, and pain in her right knee.  Tr. at 108.  On January 13, 2000, Plaintiff was seen by orthopedists at UTMB and the notes reflect she had full ROM of her hips; no atrophy in her lower extremities; equal reflexes; and 5/5 motor strength in all muscle groups.  Tr. at 271.  The x-rays of her lumbar spine showed some mild spondylitic changes in the lumbrosacral region.  Tr. at 271.  On April 6, 2000, the progress notes from Dr. Bond reflect that Plaintiff had "nearly a full ROM in back with extension," although it is noted that there was some decreased ROM in her neck.  Tr. at 265.  The CT-scan of her lumbar spine revealed mild degenerative changes at L5/S1 (Tr. at 269), and the CT-scan of her pelvis showed "no fracture or dislocation."  Tr. at 268,

---

[1] This reflects the Listing requirement in effect at the time of the ALJ's determination.

270.  On June 1, 2000, orthopedists at UTMB found that Plaintiff had minimal tenderness over the lumbar region and "some pain in the buttock in the left side," but that she had "full range of motion in her joints including her hips" and "5/5 motor strength."  Tr. at 240.  On July 3, 2000, while Plaintiff complained of bilateral leg weakness and difficulty walking, the neurological exam showed 5/5 motor strength bilaterally, sensory intact, and a normal gait.  Tr. at 335.  On August 7, 2000, doctors at UTMB noted that she was sitting in a chair with no apparent distress, she had 5/5 motor strength in her lower extremities, normal reflexes, sensation intact, normal gait, and normal heel walk and toe walk.  Tr. at 332.  On September 21, 2000, doctors at UTMB noted "no tenderness to palpitation over the lumbar region;" "no sensory deficits in either extremity;" "full ROM of the spine, hips and knees; " "her strength is 5/5 in the bilateral lower extremities;" reflexes normal; and "symmetric in bilateral lower extremities."  Tr. at 327.  In February 2001, Dr. Bond noted that she had good ROM in her back.  Tr. at 349.  On March 16, 2001, the progress notes from UTMB reflected she had full ROM in her back (Tr. at 358), her gait was normal, and her sensations were intact Tr. at 358.  With regard to her neck pain, the doctor's impression was "mild cervical spondylosis."  Tr. at 359.

Therefore, contrary to Plaintiff's allegations, the record substantially supports the ALJ's findings that she did not meet the 1.05 Listing requirement.[2]  To the extent that Plaintiff's challenge

_____

[2]   Notwithstanding the fact that there is substantial support in the medical records that Plaintiff did not have a significant limitation of ROM in her spine during the relevant period, as the Commissioner points out in her Motion (Def.'s Mot. 5-7), in order for Plaintiff to meet the 1.05 Listing requirements, she must also establish a significant motor loss with muscle weakness and sensory and reflex loss. Plaintiff has not done so, nor does she refute the Commissioner's determination on this point.  However, even to the extent alleged, substantial medical evidence supports the ALJ's finding that, during the relevant period of time, there is no radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.  Tr. 271, 318-319, 332, 327, 335, 340.

rests on the argument that the medical records expressly referenced by the ALJ do not, in and of themselves, indicate that she has full ROM in her spine (Pl's Mot. at 5-6), this claim fails.  Courts have often recognized that the fact that "the ALJ did not specifically cite each and every piece of medical evidence does not establish an actual failure to consider the evidence." *Castillo v. Barnhart*, 151 Fed. Appx. 334, 335 (5th Cir. 2005); *see also Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994) (rejecting as unnecessary a rule requiring the ALJ to specifically articulate each piece of evidence that supports his decision, as well as discussion of evidence that was rejected).  Moreover, procedural perfection in an administrative proceeding is not required and an administrative determination will not be set aside absent a showing that the substantial rights of a party have been affected.  *Morris v. Bowen*, 864 F.2d 333,335 (5th Cir. 1988).  Any error in the ALJ's decision in failing to reference every piece of medical evidence supporting this finding was harmless error, as there is no reason to believe, given the entire record, that remand would lead to a different result on this issue.  *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003);  *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law of common sense requires [a court] to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")

For the reasons stated, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this point.

## 2. *Treating Doctor Issue*

Plaintiff also contends that in considering whether she met the impairment listing, the ALJ ignored the opinions of her treating doctors that indicate that she has a "significant limited range of motion of her spine" and, instead, improperly relied upon the opinion of a physical therapist and Dr.

14

Goldstein, a non-treating, non-examining doctor.  Pl.'s Mot. at 6-9.

Ordinarily, the opinions of treating physicians are given considerable weight in determining disability, though less weight can be given if good cause is shown.  *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001).  This is especially true when the treatment period has been over a considerable period of time.  *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  Good cause includes conclusory statements from the treating physician, opinions otherwise unsupported by the evidence, or conclusions unsupported by medically acceptable clinical techniques.  *Newton v. Apfel*, 209 F.2d 448, 456 (5th Cir. 2000).  Assuming there was any such conflict, the ALJ would have the duty to resolve conflicts in the evidence and to weigh the opinions of medical consultants.  *Martinez v. Charter*, 64 F.3d 172, 176 (5th Cir. 1995); *see also Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983) (conflicts between the conclusions of different physicians are reserved for the Commissioner).

The issue at stake here is whether there was, in fact, a conflict between the opinions of Plaintiff's treating doctors and Dr. Goldstein or, as Plaintiff states, that the ALJ ignored the opinion of her treating doctors.  Contrary to Plaintiff's contentions, however, the medical records before the ALJ do not establish that the ALJ ignored the opinion of Plaintiff's treating physicians in favor of Dr. Goldstein's opinion.  Instead, consistent with Dr. Goldstein's opinion, the records of her own treating physicians note that she had full ROM in her back and hips.

Although Plaintiff attempts to point to medical evidence in the record to support her contentions, her contentions are not well taken.  Pl.'s Mot. at 9.  For example, Plaintiff initially points out that she was using crutches on March 5,1998 (Tr. at 144), yet this was almost 2 years prior to the alleged onset of her disability, and, considering her medical records in their entirety, it is apparent from Dr. Weiss' progress notes that shortly thereafter her condition improved because

15

on March 26, 1998, she was walking without the use of a cane or crutch (Tr. at 130), and, in June

1998, was able to return to work "full duty, no restriction." Tr. at 128.  Plaintiff also points to Dr.

Weiss's notes of January 7, 1999 (Tr. at 126), and January 27, 1999 (Tr. at 122, 123), yet her

reliance on these notes is misplaced because she has mistakenly construed the records to refer to her

back when, in reality, the referenced notations relate to the ROM in her left wrist.  Instead, with

regard to her back, Dr. Weiss noted that Plaintiff could ambulate without crutches or a cane and,

upon examination, had no straight leg raising sign; no calf tenderness; no hamstring spasm; good

strong dorsiflexion; and her deep tendon reflexes were equal and active.  Tr. at 122-123, 126.

Plaintiff also points to a physical therapist's notes on January 11, 1999, which reflect a decreased

range of motion in her lumbar spine (Tr. at 124), however, an ALJ is not required to consider a

physical therapist's notes which precedes the onset date of her disability, either as an opinion of a

treating doctor or in isolation of the other records.  Instead, the ALJ is entitled to consider the

therapist's note within the context of her treatment with Dr. Weiss which, in late January 1999,

reflected that her condition had improved.  Tr. at 122-123.  Finally, Plaintiff points to the February

10, 2000, record from Dr. Mikkilineni which reflects that she had tenderness in her lumbar spine and

pain on flexion and extension.  Tr. at 220.  Dr. Mikkilineni saw Plaintiff on this one occasion for

purposes of consultation and his notes do reflect Plaintiff had some tenderness in her lower back and

pain on flexion and extension, but the records do not contain an assessment of her ROM.

Taking the record as a whole, which the ALJ is entitled to do, there is ample evidence from

Plaintiff's treating doctors documenting a good or normal ROM during the relevant time period.

*See Johnson*, 864 F.2d at 343-44 (a court does not reweigh evidence or review issues *de novo*).

Plaintiff has shown no reason for concluding that the ALJ's decision to credit Dr. Goldstein's

assessment, which is consistent with that of own her treating doctors, is not supported by substantial evidence.   The Court therefore **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this issue.

### 3. *Consideration of Combined Impairments Issue*

Plaintiff next alleges that the ALJ's finding that none of her impairments, either individually or in combination, are attended by clinical findings, which meet or equal the Listing, is merely speculative because he did not utilize a medical expert.  Pl.'s Mot. at 10.

This Circuit recognizes that "an individual's combined impairments can prohibit substantial gainful activity." *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis for eligibility under the section, the Commissioner of Social Security shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C.A. § 423(d)(1)(A).

In his decision, the ALJ expressly found none of Plaintiff's impairments, "either individually or in combination, are attended by clinical findings which meet or equal the medical criteria for any impairment" listing.  Tr. at 22.  Contrary to Plaintiff's assertions, the ALJ's opinion reflects that he obtained an opinion from a medical expert, Dr. Goldstein.  Tr. at 365.  Relying on the evidence in the record, Dr. Goldstein, the medical expert, opined that Plaintiff had several impairments: (1) degenerative disk disease in her cervical spine; (2) coccygodynia; and (3) moderate to severe hearing loss.  Tr. at 365.  Plaintiff does not dispute the determination of her impairments.  Dr. Goldstein further opined that these impairments, considered separately or combined, did not meet or equal the

listing requirements.  Tr. at 365.[3]  Absent evidence to the contrary, the ALJ is entitled to consider the medical expert's opinion in making his Step 3 determination.

Moreover, as set forth above, the ALJ clearly stated that he considered the combined effect of Plaintiff's ailments and it does not appear that his statement to this effect was merely rote. Instead, in reviewing his opinion, the Court finds the ALJ considered Plaintiff's impairments and it can not be concluded that he "so fragmentized [the Plaintiff's] several ailments ... that he failed to properly evaluate their effect in combination."  *See Owens*, 770 F.2d at 1282.  For example, consistent with Dr. Goldstein's opinion, the evidence before the ALJ did not support a finding that Plaintiff's back had deteriorated to such a degree as to find her disabled *per se* at any time through June 20, 2001.  In fact, as discussed above, the substantial medical evidence showed Plaintiff had normal or good ROM (Tr. at 240, 265-266, 271, 311, 327, 340, 351, 358-359), normal neurological examinations (Tr. at 271, 318-319, 332, 327, 335, 340), and the x-rays, CT scan, and full bone scan revealed no fracture in her tailbone.  Tr. at 105, 263, 268, 270, 316.  Further, the evidence before the ALJ did not support a finding that Plaintiff's hearing problems had deteriorated to such a degree as to find her disabled.  Instead, the evidence before the ALJ showed that Plaintiff, while having moderate to severe hearing loss, had experienced the hearing problem when she was a young child; that she had previously worn hearing aids to improve her hearing, but did not wear them now only because they were damaged in a prior automobile accident and were not replaced; her audiologist recommended a hearing aid evaluation and binaural amplification, but she had not yet complied with this recommendation; that she was adept at reading lips as evidenced by her ability to understand and fully participate in the administrative hearing; and that her hearing problems had never

---

[3] Notably, none of Plaintiff's treating doctors provided an opinion on the issue.

prevented her from working.  Tr. at 23.  Finally, there is no evidence that the combined effects of these impairments is sufficient to warrant a finding of disability at Step 3.  A claimant for disability benefits has the burden of proving disability.  *See Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).

Plaintiff has failed to bear her burden of proof on this point and has not established the ALJ's finding was erroneous.  Accordingly, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this issue.

### 4. *Severity of Knee Impairment Issue*

Finally, with regard to impairment issues, the Plaintiff alleges that the ALJ erroneously failed to find that the arthritis in her right knee constituted a "severe" impairment.  Pl.'s Mot. at 10. Plaintiff claims her burden of showing severity is "mild," and, in support of this argument, cites an opinion from the 11th Circuit.  Pl.'s Mot. at 11.  Plaintiff's reliance upon the 11th Circuit case is misplaced.

The burden is on the Plaintiff at step three to demonstrate that she has a severe impairment as set out in the Social Security Act.  *Anthony*, 954 F.2d at 293.  The Fifth Circuit has determined that an impairment is not severe "if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985); *see also*, *Anthony*, 954 F.2d at 293-95.

As Plaintiff points out, on February 10, 2000, Dr. Mikkilineni found that Plaintiff had arthritis of the right knee and, on that date, experienced some pain and difficulty hopping.  Tr. at 221.  The symptoms that Plaintiff experienced on this visit, however, were not so abnormal as to be considered severe under the *Stone* criteria.  For example, although Plaintiff complained of weakness

in her lower legs on July 3, 2000 (Tr. at 335), the objective findings on that date reflected that her motor strength was 5/5 throughout; her sensation was intact bilaterally; her ROM was within acceptable limits; her gait was stable; and her toe and heel walk was within normal limits.  Tr. at 335.  A full body bone scan in February 2001 was also normal.  Tr. at 316.  Moreover, there was no ongoing evidence of any further symptoms of a knee problem, nor was there any evidence that it would interfere with any kind of work activities or functioning.[4]  For example, the medical records before the ALJ show that Plaintiff's gait was normal, she had normal motor strength in her lower extremities, and she did not utilize crutches or a cane during the relevant time period.  Tr. at 220-221.  Therefore, contrary to Plaintiff contentions, ample evidence exists in the record for the ALJ to reasonably conclude under the *Stone* criteria that the arthritis in her right knee only had a minimal effect on Plaintiff and would not be expected to interfere with her ability to work.

For these reasons, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this point.

### D.  Plaintiff's Challenges to ALJ's Step 4 Findings

Plaintiff challenges the ALJ's determination at step 4 concerning her residual functional capacity based a number of grounds.

#### 1. *Hearing Limitation*

Plaintiff first alleges the ALJ improperly concluded that her hearing loss was correctable with a hearing aid because this conclusion is contrary to her testimony at the hearing.  Pl.'s Mot. at 11-12.  In essence, Plaintiff claims that due to the ALJ's error, substantial evidence does not support

---

[4] Notably, Plaintiff did not include her knee as an injury or condition that limited her ability to work.  Tr. at 63.

his assessment that in spite of her hearing problems, she retained the residual functional capacity to perform her past work relevant work.

The Social Security regulations define residual functional capacity ("RFC") as the maximum degree to which the individual retains the capacity for sustained performance of the physical and mental requirements of jobs.  20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c).  An ALJ has the responsibility for determining a claimant's RFC.  *Ripley*, 67 F.3d at 557.  The ALJ's determination is reached through a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

In assessing her RFC, the ALJ considered Plaintiff's hearing impairment and found "[a]lthough the claimant has moderate to severe hearing loss, she testified that she has had such hearing loss since the age of 10 and it has not prevented her from working."  Tr. at 23.  The ALJ goes on to find "[m]oreover, her hearing loss is correctable with a hearing aid, as the claimant acknowledged in her testimony."  Tr. at 23.

A review of Plaintiff's testimony supports the reasonable conclusion a hearing aid could improve the hearing in her left ear, however, as pointed out by Plaintiff, it is at odds with her *testimony* regarding her right ear.  Tr. at 378-379.  Despite any such error, however, the issue at stake here is whether substantial evidence supports the ALJ's assessment of her RFC.  This Court finds  substantial evidence supports the ALJ's finding that, in spite of her hearing impairment, she retained the capacity to perform her prior relevant work.  For example, the records before the ALJ show Plaintiff suffered from a biaural hearing loss, which she has had since she was approximately 10 years old.  Tr. at 23, 354, 378.  She testified that she wore hearing aids in high school, but did not

have the hearing aids now only because they were broken in an automobile accident and were not replaced.  Tr. at 378.  She saw a neurologist after her 1992 auto accident and he recommended that she undergo audiometric testing.  Tr. at 161.  A review of the records before the ALJ do not reflect she had any such testing following the 1992 recommendation.  Plaintiff's hearing was tested by an audiologist on November 26, 1999, and showed her hearing was in the "moderate to moderately severe to severe range" with her left ear being better (with hearing in the 55-60 range) than her right ear (with hearing in the 65-70 range).  Tr. at 111.  Plaintiff's hearing was retested on April 12, 2001, and she was found to have moderate hearing loss in her left ear and severe hearing loss in her right ear.  Tr. at 354.  The audiologist, however, recommended that she undergo a hearing aid evaluation and, pending the evaluation, be fitted for hearing aids.  Tr. 354.  Plaintiff was not wearing hearing aids at the time of the hearing.  Tr. at 374, 378.  She is adept at reading lips and she was able to understand and actively participate in the hearing.  Tr. at 374-383.  However, as reflected in the ALJ's opinion, perhaps the most significant evidence was that, despite her long-standing hearing impairment, Plaintiff's condition had never prevented her from working.  Tr. at 64,72-73, 84.  *See Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987) (ability to work despite a pre-existing condition supports ALJ's finding of no disability).

The Court therefore **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this point.

### 2.  *Light Work Determination*

Plaintiff next alleges the ALJ erred by finding that she was able to do light work because it is not supported by substantial evidence in the record.  Pl.'s Mot. at 12.

The ALJ found that notwithstanding Plaintiff's impairments, she retained the capability of performing light work.  The Social Security Regulation defines "light work" as follows:

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

The essence of Plaintiff's objection to the ALJ's conclusion is that in reaching it, he relied on an undated report from Dr. Bond that set forth his opinion that Plaintiff should not lift more than 20 pounds.  Pl.'s Mot. at 12.  Plaintiff claims that because Dr. Bond's report is undated, it is defective and should not have been considered by the ALJ.  Plaintiff's argument seems somewhat odd considering that this report was, in fact,  submitted by Plaintiff's counsel to the ALJ for consideration on April 25, 2001.  Tr. at 360-361.  Furthermore, although undated, Dr. Bond's "Attending Physician Statement" clearly refers to Plaintiff's referral for consultation to Dr. Heilman, who Plaintiff saw in May and October 2000, to UTMB neurology, which occurred in July and August 2000, and also sets forth that Plaintiff was last seen on April 18, 2001.  Tr. at 361.  Plaintiff cites to no authority, nor is the Court aware of any, that would limit the  ALJ from considering this additional evidence supplied to him by Plaintiff herself.  Plaintiff's objection fails.

Moreover, contrary to Plaintiff's apparent contentions, this Court finds substantial evidence in the record to support the ALJ's finding that she retains the ability to perform light work.  For example, the records before the ALJ reflect that on January 13, 2000, an "Attending Physician Statement" was completed by an orthopedist at UTMB.  He expressed the medical opinion that Plaintiff was capable of returning to work on a full time basis with current occupational limitations

or restrictions, to include the inability to sit or stand for prolonged periods of time (*i.e.,* over 3-4 hours) (Tr. at 239, 342), which was consistent with Plaintiff's own statement to her doctors that she was able to "stand for 3-4 hours as well as sit for 3-4 hours." Tr. at 271. On December 14, 2000, an orthopedist at UTMB wrote a "To Whom It May Concern" letter which reiterated that "because of her tailbone pain, she was unable to sit or stand for long periods of time." Tr. at 312. The records also reflect that on March 27, 2000, Dr. Bond completed an "Attending Physician Statement" in which he recommended only that Plaintiff's limitations or restrictions include refraining from lifting more than 10 pounds, and that he believed that this restriction or limitation would change to the point that she could return to work on a part-time basis on May 1, 2000. Tr. at 238. Moreover, as discussed, Dr. Bond later expressed his opinion that she would be able to lift objects up to, but not exceeding, 20 pounds. Tr. at 361. Finally, also before the ALJ was the opinion of medical expert, Dr. Goldstein, who found Plaintiff had full ROM in her spine and normal neurological exams. Tr. at 23, 365.[5]

Plaintiff fails to bear her burden of proof on these points. For these reasons, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on these points.

### 3. *Ability to Perform Past Relevant Work*

Plaintiff alleges the ALJ erred in determining that she could perform her past work because the file does not adequately describe her past work, the ALJ did not elicit testimony or question her about her past work, and failed to elicit the testimony of a vocational expert regarding the actual

---

[5] The Court notes that Plaintiff again reiterates her prior argument that Dr. Goldstein's opinion concerning her ROM is not supported by substantial evidence. However, for the reasons discussed above, her argument fails.

physical and mental demands of Plaintiff's past work.  Pl's Mot. at 12-13.  Plaintiff goes on to allege

that the only evidence presented in the hearing regarding Plaintiff's job was that she worked for four

hours a day doing "office work" for an automobile repair shop.  Pl's Mot. at 13.  Plaintiff's claims

are unfounded.

The record reflects that while Plaintiff may have only testified at the hearing that she did

"office work" for an auto repair shop, the evidence before the ALJ contains Plaintiff's responses to

questionnaires in which she details the nature of her past work and the requirements.  Tr. at 84-88.

For example, Plaintiff  describes her office manager job as one in which she would pick-up parts,

drop-off and pick-up customers, make screens, answer phones, and bookkeeping.  Tr. at 64, 85.  She

further states that in any given day her job requires her to spend 2 hours walking, 2 hours standing,

3 hours sitting, 30 minutes climbing, 20 minutes kneeling, 10 minutes crouching, 1 hour handling

or grabbing big objects, and 1 hour writing, typing or handling small objects.  Tr. at 64.  She also

responded that in this job the heaviest weight she has ever lifted is 20 pounds and that she frequently

lifts less than 10 pounds.  Tr. at 64, 85.  Plaintiff described her work as a secretary/treasurer for a

sign placement business as "sign placement, bank deposits, billing duties."  Tr. at 88.  She describes

the kind and amount of physical activity for this job in a typical day as follows: 2 hours walking, 5

hours standing, 5 hours sitting, bending occasionally, and frequently lifting up to 10 pounds.  Tr. at

88.  Finally, the record also contains Plaintiff's description of her work in a hospital as a "senior

insurance verifier" and "pre-admitting" clerk.  Tr. at 86-87.  She describes her duties for this work

as pre-admitting people for regular admissions and for transplants, verifying insurance, answering

phones, and assisting people with information.  Tr. at 86-87.  She describes the kind and amount of

physical activity for this job in a typical day as follows:  2 hours walking and standing, 4 hours

sitting, bending occasionally, and frequently lifting up 10 pounds.  Tr. at 86-87.

Therefore, contrary to Plaintiff's contentions, there was ample evidence before the ALJ for him to find that "[a]s she described it, the claimant's past relevant work as an office manager, secretary/treasurer of a sign placement business, hospital insurance verifier, and hospital pre-admitting clerk were all light or sedentary in exertional demands, which is confirmed by the Dictionary of Occupational Titles."  Tr. at 25.  *See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990) (the Commissioner may consider the description of the claimant's past work as such work is generally performed in the national economy).  Moreover, the mere inability of a claimant to perform certain "requirements of [her] past job does not mean that [s]he is unable to perform 'past relevant work' as that phrase is used in the regulations."  *Jones v. Bowen*, 829 F.2d 524, 527, n. 2 (5th Cir. 1987) (per curium).  The ALJ, considering all Plaintiff's impairments, properly found that Plaintiff could perform her past relevant work and, therefore, was not disabled under the Act.  Tr. at 23-26.  *See Owens*, 770 F.2d at 1282 (the ALJ had not "so fragmentized [the claimant's] several ailments ... that he failed to properly evaluate their effect in combination upon this claimant").  Finally, contrary to her contentions, vocational testimony is not required at step four.  *Williams v. Califano*, 590 F.2d 1332, 1334 (5th Cir. 1979);  20 C.F.R. § 404.1566(e).

Plaintiff fails to bear her burden of proof on these points.  For these reasons, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED** on this point.

### 4.  *The Subjective Complaint of Pain Issue*

Plaintiff alleges that the ALJ erred in improperly discounting her credibility regarding her subjective complaints of pain.  Plaintiff claims that the ALJ improperly characterized her visits to

the doctor as "infrequent and sporadic" and ignored objective evidence in the record which supported her subjective complaints. Pl.'s Mot. at 15.

It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference as long as it is supported by substantial evidence. *Newton*, 209 F.3d at 459; *see also*, *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). The judge must consider a claimant's testimony and must indicate reasons for the credibility decision. *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1983).

Plaintiff initially objects to the ALJ's characterization that her doctor's visits were infrequent and sporadic as she claims this is not substantially supported by the record. Plaintiff's claim is unfounded. Reviewing the entire record and considering her visits to each of the different doctors, the ALJ's comment does not appear to be completely unjustified. For example, the records before the ALJ reflect that after the alleged onset of her disability on November 1, 1999, Plaintiff saw Dr. Weiss only twice–on December 6, 1999, and January 6, 2000. Tr. at 108, 262. She went to the emergency room at UTMB on December 22, 1999 (Tr. at 344, 347), and followed-up at the outpatient clinic on January 13, 2000 (Tr. at 271-273), but the records do not reflect that she was seen at UTMB's outpatient orthopedic clinic again until early June 2000. Tr. at 240-240, 340-341. Plaintiff was then seen by doctors at UTMB approximately once a month until September 21, 2000. Tr. at 327. The records also reflect she attended physical therapy at UTMB on October 9 and 24 and November 13 (Tr. at 325), and then returned to the outpatient clinic on December 14, 2000 (Tr. at 320), January 22, 2001 (Tr. at 318-319) and March 16, 2001. Tr. at 358-359. The records before the ALJ also show that Plaintiff saw Dr. Bond on March 17, 2000, and in April 2000 (Tr. at 265-266), but it does not appear that she returned to see him until October 6, 2000 (Tr. at 308), after

27

which time she saw him once a month on November 9, 2000 (Tr. at 309), December 13, 2000 (Tr. at 311, 351), January 17, 2001 (Tr. at 350), and February 14, 2001. Tr. at 349. Finally, the records reflect that she saw Dr. Heilman on May 18, 2000, and again on October 10, 2000, for a surgical evaluation. Tr. at 314-315.

Plaintiff also contends the ALJ erred in discounting her subjective complaints of pain because he ignored objective evidence that supported her subjective complaints of pain. Plaintiff points to medical evidence in the record to support her claims. The Court, of course, does not re-weigh evidence or review issues *de novo*. *See Johnson*, 864 F.2d at 343-44. The Court notes that the ALJ, after carefully noting the requirements for evaluating a claimant's subjective symptoms and summarizing her testimony, found her subjective complaints of pain not wholly credible because "[t]he medical record fails to show any severe dysfunctioning of a bodily organ, gross orthopedic abnormality, or significant and persistent neurological deficits which can reasonably account for the degree of pain and functional limitation which the claimant alleges." Tr. at 24. Substantial evidence exists in the record to support the ALJ's finding. The ALJ noted her x-ray studies and CT scan were normal with only a finding of "mild degenerative changes." Tr. at 25. Also before the ALJ was a cervical MRI, which showed only "minimal broad-based bulges" without significant stenosis or abnormal signal (Tr. at 267); and a full body bone scan which was normal. Tr. at 316. Plaintiff's neurological exams were normal. The ALJ further noted that she had not been hospitalized for treatment or care, and there was "no finding that she requires surgery." Tr. at 25. The ALJ also found that "[h]er medication appears to be effective" and she "has not complained to treating physician about the ineffectiveness of the pain medications." Tr. at 25.

Although Plaintiff may experience pain in her neck, back, and tailbone, the mere existence of pain is not an automatic ground for obtaining disability benefits. *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980). Nor is the fact that a claimant cannot work without pain a basis for a disability finding. *Barajas,* 738 F.2d at 644; *see also Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment" in order to be disabling).

Finally, it is well established in this Circuit that the absence of objective factors indicating the existence of severe pain – muscle atrophy, limitations in range of motion, weight loss, or impaired nutrition – can itself justify an ALJ's credibility decision. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); *Falco*, 27 F.3d at 163. There was no evidence of muscle atrophy, weight loss, impaired nutrition, and her range of motion, while at times decreased, was generally found to be normal.

Based on this record, insufficient evidence exists to conclude that deference should not be given to the ALJ's credibility assessment. The Court therefore **RECOMMENDS** that Plaintiff's Motion be **DENIED** and that Defendant's Motion be **GRANTED** on this issue.

## <u>Conclusion</u>

For all the reasons stated above, Plaintiff has not carried her burden of proof in showing that the ALJ's decision is not supported by substantial evidence. The Court, therefore, **RECOMMENDS** that the Plaintiff's Motion for Summary Judgment (Instrument No. 11) be **DENIED;** Defendant's Motion for Summary Judgment (Instrument No.12) be **GRANTED;** and that this action be **DISMISSED**.

The Clerk **SHALL** send copies of this Report and Recommendation to the Parties.  The Parties **SHALL** have until **October 13, 2006**, in which to have written objections, filed pursuant to 28 U.S.C. § 636(b)(1)(C), **physically on file** in the Office of the Clerk.  <u>The Objections **SHALL** be electronically filed and/or mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553</u>.  **Any Objections filed SHALL be contained in a written document specifically entitled "Objections to the Report and Recommendation of the Magistrate Judge"**, which will then be forwarded to the District Judge for consideration.   Failure to file written objections within the prescribed time **SHALL** bar the aggrieved party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas, this_____22nd_____ day of September, 2006.

_____
John R. Froeschner
United States Magistrate Judge